## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

### Case No. 15-cv-579-36AEP - Civil

CHARLES SMITH
and DOROTHY CAPEZZA,

      Plaintiffs,

vs.

THE VILLAGE CLUB, INC,
d/b/a BROOKHAVEN VILLAGE, INC.,
and JIM RUBERT, individually,
JOHN BERNDT, individually,
JOYCE BURTON, individually,
MICKIE CRITTENDEN, individually,
and TAMMY WALKER, individually
      Defendants.
_____/

### PLAINTIFFS' MOTION FOR  SUMMARY JUDGMENT  ON DEFENDANTS' LIABILITY

COME NOW, Plaintiffs, CHARLES SMITH and DOROTHY CAPEZZA, by and through their undersigned counsel and, pursuant to Fed.R.Civ.P. 56 move for summary judgment as to liability of the Defendants for violations of the Fair Housing Amendments Act, 42 U.S.C. §3601 *et seq*.,  and in support thereof state.

## I.      INTRODUCTION

At the time of filing this action Plaintiffs Charles Smith and Dorothy Capezza lived in a mobile home community in Polk County known as Brookhaven Village. While living there Charles Smith suffered from severe hearing loss in both ears, and relied upon his dog Roxy to help him cope with his disability. Dorothy Capezza suffered from, and  continues to suffer from major depression and severe anxiety. Capezza benefited from living with her dog Buttons before

Buttons was euthanized on February 13, 2015.  Buttons provided emotional support and companionship that helped  ameliorate the symptoms of Capezza's depression and anxiety.

The then president of Brookhaven's board told Capezza and Smith they were approved by Brookhaven to live with their assistance animals before either purchased lots  in the community. Yet on December  3, 2014 both Plaintiffs were sent letters by Brookhaven's counsel, Dan Pilka, claiming they were in violation of Brookhaven's no-pet rule, and demanding that they remove their dogs or face legal action.

Plaintiffs idvidually responded to the letter from Attorney Pilka explaining that they needed their dogs because of disabilities and informing him that they had been previously told their dogs were approved. Notwithstanding the facts that Brookhaven had no reason to dispute that Capezza and Smith were told their assistance animals were approved before they moved to the community, and that Brookhaven had no objective reason to dispute that Capezza and Smith needed an accommodation for their dogs, Capezza and Smith were both subsequently commanded to provide unspecified medical documentation and proof that their assistance animal were trained. A few days later they were targeted with a threat of litigation if they did not participate in and pay for "statutory pre-suit mediation."

On February 23, 2015 all five of the individually named Defendants voted to initiate legal action against Smith and Capezza. Brookhaven filed suit against Smith on March 21, 2015, seeking removal of his assistance animal and asking that Smith be forced to pay Brookhaven's attorney's fees. Smith was so distressed by how he was treated at Brookhaven he sold his home in the community shortly thereafter.

As of the time of this filing, Capezza has not been granted an accommodation so that she may obtain another emotional support animal. Capezza has been without an emotional support

animal for more than a year, and has experienced a significant increase in her symptoms of depression and anxiety, including difficulty sleeping, and feelings of hopelessness  anxiousness and despair. While she previously walked Buttons three times a day, Capezza has become essentially housebound and socially isolated, rarely leaving her home.

## II.    PLAINTIFFS' STATEMENT OF MATERIAL FACTS

### A. MATERIAL FACTS REGARDING CHARLIE SMITH

1.    At the time this suit was initiated, Plaintiff Charlie Smith suffered severe hearing loss and resided at Brookhaven with a dog that would alert him to sounds such as a doorbell or an intruder. This was especially important because Smith could not sleep with his hearing aids in, and hence could not hear at all during the night. [Declaration of Judy Shimunek, Exhibit A, ¶ 4,5]

2.    It is undisputed that Smith's assistance animal (a Silky Terrier breed dog named "Roxy")  had no specialized training to be a "service dog." [Ex. A, ¶ 5]

3.    Before Smith moved to the Brookhaven community, he was told that his need to live with his dog would be accommodated. [Ex. A, ¶ 6] [Declaration of David Milne, Ex. E, ¶ 7] Brookhaven had no reason to doubt that Smith had been led to think his dog was approved. [Ex. F, pg 33]

4.    Notwithstanding having obtained prior approval for his assistance animal, on December 3, 2014, Smith was sent a letter from Brookhaven's counsel, Dan Pilka, demanding that Smith remove his dog within 30 days "in order to avoid the possibility of legal actions being initiated." [Ex. A, ¶ 6] [Amended Complaint, DE 26, Ex. A] When Smith replied that his dog was a service dog that he needed because of a disability, [DE 26, Ex. B] on December 23, 2014, Brookhaven, again through counsel, demanded "medical records, reports and/or documents"

3

proving Smith was disabled, and proof that the dog was trained to be a service animal. [DE 26, Ex. C], which was followed up on January 6, 2015 with a "STATUTORY OFFER TO PARTICIPATE IN PRE-SUIT MEDIATION" threatening that if Smith did not capitulate and take part in mediation, for which he would be 50% financially responsible, "suit may be brought against you by the Association without further warning." [DE 26, Ex. D]

5.      On February 20, 2015 counsel for Plaintiffs sent Brookhaven's counsel a lengthy letter [DE 26, Ex. E] in which she cited HUD regulations and case law establishing that for purposes of the FHA, assistance animals do not require special training, and provided Attorney Pilka copies of the  Joint Statement of the Department of Housing and Urban Development and the Department of Justice entitled "Reasonable Accommodations Under the Fair Housing Act" [DE 26, Ex. F] and the Department of Housing and Urban Development's guidance memorandum entitled "Service Animals and Assistance Animals for People With Disabilities in Housing and HUD-Funded Programs." [DE 26, Ex. G] Plaintiffs' counsel concluded the correspondence as follows :

> "I am hopeful that this matter can be worked out without further escalation. I would appreciate prompt confirmation that my clients will not be further hassled by you or the association regarding their dogs. If you have an objective reason to doubt that there is a legitimate need for an accommodation, please let me know and we can begin the interactive process to provide you verification within the parameters HUD and courts have established regarding the appropriate scope of inquiry that can be made by a housing provider."

6.      Four days later, on February 24, 2015, Plaintiffs' counsel again reiterated that they were not refusing to provide the association information it legitimately needed. Her email, [Ex. I],  stated in relevant part:

> My clients should not have to lawyer up and pay for a mediator in order to obtain an accommodation for an assistance animal.  In fact the process should be simple and should not be intrusive. If Brookhaven wishes to pay for my time to come to Winter Haven and foot the bill for the mediator, I will ask my clients to participate. I hope I have

_made myself very clear that my clients are willing to provide the association the verification to which it is entitled by law, but serving a demand for pre-suit mediation is NOT engaging in the interactive process._ (emphasis added)

7.      Also on February 24, 2015, Smith's counsel forwarded a letter written by Dr. Gyl Kasewurm verifying that Charlie Smith has suffered severe hearing loss in  both ears and that he has difficulty hearing even though he utilizes hearing aids. [DE 26 Ex. H] Smith's counsel's letter further explained that the dog "alerts him when someone is at the door by barking loudly and jumping on the bed, or circling Mr. Smith's legs if he is in a chair," and that the dog would alert him if there was an intruder. [DE 26 Ex. H]

8.      Rather than reaffirm that Smith's need for his dog would be accommodated,  on March 23, 2015 Brookhaven sued Smith in state court seeking an injunction forcing removal of his service animal and judgment against Smith for Brookhaven's attorney's fees and costs.  See _The Village Club Inc. d/b/a Brookhaven Village_, Case No. 2015CC-001289-0000-00, [Ex. B].

B.      **MATERIAL FACTS REGARDING DOROTHY CAPEZZA**

9.      Dorothy Capezza is an eighty-two year old woman with a long history of suffering from major depression. Anxiety was added to the diagnosis of major depression in 2014, and she has been taking psychoactive medications for her mental impairments for several years. Capezza's mental impairments impact her cognition, her ability to work, care for herself and her ability to otherwise carry out daily life activities. [Declaration of Dr. Erika Friedmann, Ex. C, ¶ 2]

10.      Like Smith, prior to moving to Brookhaven Village, Capezza provided board president  Frank Nutter documentation of her need to live with her emotional support animal, and was told she was approved by the board to have her dog. [Declaration of Dorothy Capezza, Ex.

D, ¶ 5-6] [Declaration of David Milne, Ex. E, ¶7] Brookhaven had no reason to doubt that Capezza had been told by Nutter that she was approved to have her dog. [Ex. F, pg 36]

11.     Capezza asked Frank Nutter, then President of Brookhaven's board, what she needed to have her dog in Brookhaven's no pet section. He told her that she had to get a note from her doctor saying she needed the dog, and have him registered. Capezza did so and was told by Nutter that the information had been reviewed by four board members and they approved of her moving in with Buttons. [Ex. H, pg 19]

12.     As detailed in the amended complaint [DE 26] and her response to Defendants' motion for partial summary judgment [DE 66], Capezza was targeted with the same December 3, 2104 form letter demanding that she remove her dog or risk legal action [DE 27, Ex I] as was sent to Plaintiff Charlie Smith.

13.     On December 17, 2014, Capezza responded to the demand that she remove her dog by informing Brookhaven's counsel she had been approved to live with her dog before buying a lot in the community, and at that time her doctor had provided a letter verifying her need for her dog to help her cope with severe anxiety, which had worsened since she had received a letter demanding she remove Buttons. [DE 26: Exhibit J]

14.     On December 31, 2014 Capezza  was sent a letter by Brookhaven's counsel directing that she 1) produce "medical records, reports and/or documents to demonstrate that you are suffering from a medical disability or handicap that has been diagnosed, unless your medical disability or handicap is readily ascertainable;" 2) "Demonstrate how this emotional service animal reasonably accommodates your medical or psychiatric disability or handicap. This would include providing a copy of the prescription written by a healthcare provider;"  3) "Demonstrate the emotional service animal has special skills or training to accommodate your medical

disability or handicap. This would include providing any certification that the animal has received which notes its training as a service animal or emotional support animal;" and 4) "Demonstrate how the special skills or training of the service animal or emotional support animal set it apart from an ordinary pet." [DE 26 Ex. K] A week later, on January 6, 2015, Capezza was also targeted with a "STATUTORY OFFER TO PARTICIPATE IN PRE-SUIT MEDIATION." The "statutory offer" stated:

> "In the past you have received numerous requests from the Association to bring your property into compliance by submitting an application and documentation for the dog you are keeping  at your property. Yet, despite numerous requests to remedy these situations by your Association and by its Property Manager, you went ahead without submitting an Application and documentation for the Board to review and approve. These requests have been totally ignored by you and as a result your property has been referred to our firm for legal action."

15.    The statutory offer, which was a statutory prerequisite to filing suit against Capezza, informed Capezza that she would have to pay for 50% of the costs of mediation, and that if she failed to capitulate to the "offer" to mediate "suit may be brought against you by the Association without further warning." [DE 26, Exhibit I].

16.    Since Capezza's dog had to be humanely euthanized, Capezza is much more anxious and depressed and rarely leaves her home. [Ex. D ¶ 7] [Exhibit H, pg 55-57]

17.    Capezza still needs an emotional support animal, but is afraid of being fined and sued by Brookhaven if she obtains one. [Ex. D ¶ 7]

**C.    MATERIAL FACTS REGARDING DEFENDANTS**

18.    On March 1, 2016 Brookhaven's Corporate Representative Tammie Walker was deposed on these topics:

> 1. The basis for the failure to allow Dorothy Capezza to replace her emotional support animal.
> 2. The basis for the lawsuit filed by Defendant against Charlie Smith.
> 3. The allegations in the complaint filed by Charlie Smith and Dorothy Capezza.

7

4. The affirmative defenses raised by Defendant in its Answer to the Complaint.
5. The designation of a portion of the Brookhaven community as allowing pets.

The transcript of the Corporate Representative's deposition is Exhibit F to this motion. The notice of deposition is Exhibit G to this motion, pg 1-3. [Exhibit G contains all the Exhibits to the March 1, 2016 Corporate Representative Deposition].

19.     The minutes of a December 9, 2013 meeting of Brookhaven's board appear to reflect that there was a discussion of dogs in the interior no-pet section of the community, including "discussion of the fact that the individuals were told they could bring the dogs in and they should be granted a waiver."  [Ex. G, pg 238 of 251]

20.     The minutes of a January 6, 2014 meeting of the board reflect that Frank Nutter "mentioned there was a new woman coming into the park with all the paperwork giving her authority to have her animal in the no pet section." [Ex. G, pg 243 of 251]

21.     Brookhaven had no reason to disbelieve that Smith had in fact been told before moving to the community that his dog would not be a problem [Ex. F, pg 33, lines 7-16], and that Brookhaven had no objective reason to doubt that Mr. Smith needed a dog to help him compensate for his hearing loss. [Ex. F, Pg 73, lines 6-11]

22.     Brookhaven's corporate representative could not explain why the letter from Mr. Smith's doctor verifying Mr. Smith's hearing loss was not adequate,  [Ex. F, pg 40 lines 11-20], why Smith had not been given an accommodation for Roxy [ Ex. F, pg 17] and was unsure whether it is still Brookhaven's position that a service animal or hearing animal that helps someone with a hearing loss must be trained and certified. [Ex. F, pg 30, lines 12-19] In spite of being produced as the corporate representative to testify regarding the basis for the lawsuit filed against Charlie Smith, Brookhaven's representative claimed not to even know whether a lawsuit had been filed against him. [Ex. F, pg 42 lines 12-17]

23.     Counsel for Brookhaven elicited from his client's corporate representative that Ms. Capezza has never requested permission from the Board to obtain another dog to be her emotional support animal.   [Ex. F, pg 93] Capezza, an eighty-two year old woman that Brookhaven acknowledges had a long history of anxiety and depression, [Ex. F, pg 66], testified she had not given the Brookhaven additional information because "she had already done what was asked of her, and that "there was no need to go to a new board and start all over again. I can't handle it. I'm going to be very honest with you. I really can't handle it."[Ex. H, pg 39]

24.     Capezza testified as to her hesitation to make a second request for an accommodation of the current board because she is "not one to upset the apple cart," and because of  rude comments she had received from other residents regarding Buttons. [Ex. H, pg 42-45]

25.     In spite of the attempt of Brookhaven's counsel to elicit testimony to the contrary, Brookhaven is fully aware that Capezza wants an accommodation for an emotional support animal. Capezza's attorney wrote counsel for Brookhaven on February 20, 2015, a week after Buttons was euthanized, explaining that Capezza was not required to show an emotional support animal has training and that Capezza already provided documentation from her doctor that she needs a dog for her anxiety.  The correspondence indicated that if there was a legitimate reason to doubt the need for an accommodation "we can begin the interactive process to provide you verification within the parameters HUD and courts have established regarding the appropriate scope of inquiry that can be made by a housing provider." When no further inquiry was ever made by Brookhaven, and Brookhaven's board voted to initiate legal action on February 23, 2015, the instant suit was initiated. The complaint before this court clearly states "Buttons had to be humanely euthanized because of health reasons on February 13, 2015. CAPEZZA would like to obtain another emotional support animal to assist her with her anxiety, but has not done so

because of the pending demands for extraneous information regarding her disability and threat of litigation." [DE 26, pg 10, ft note1] Further, the requested relief in the complaint includes that both Plaintiffs be given a waiver of Brookhaven's no pet rule as an accommodation of their disabilities. [DE 26, pg 28]

26.     When Brookhaven was asked if the Board was aware that Capezza wants an emotional support animal, the witness stated "the only thing the board is aware of are these lawsuits."  When posed the question: "Okay. By the fact that she has filed a lawsuit asking that the Court order the association to allow her to have an emotional support animal, is that not evidence of the fact that she wants an emotional support animal?" counsel for Brookhaven instructed the witness not to answer the question. [ Ex. F, pg 98, lines 10-25]

27.     Having, by happenstance of this lawsuit, been provided five years worth of Ms. Capezza's medical records and the Declaration of Dr. Friedmann,  the Corporate Representative conceded that Brookhaven has sufficient information to grant Capezza's request for accommodation. [Ex. F, pg 101, lines 10-15].

28.     It is undisputed that allowing Capezza to have an emotional support animal would not impose an undue financial or administrative burden or fundamentally alter the nature of the services Brookhaven provides. [Ex. F, pg 67] Nonetheless, as of the date of this filing, Capezza has not been given an waiver of Brookhaven's no-pet rule as an accommodation of her disability so that she may obtain an emotional support animal.

29.     Brookhaven's counsel, before directing his witness not to answer the question regarding whether the corporation is aware of Capezza's desire for an accommodation by virtue of having been served a lawsuit stating Capezza wishes to obtain another dog for emotional support but is afraid of being sued, (presumably not an unrealistic concern given the suit filed

against her co-plaintiff Charlie Smith,) made much ado of Capezza not having again asked that she be given an accommodation for an emotional support animal. [Ex. F, pg 93]   However, Brookhaven has no written policy directing how a person would request an accommodation, or that would inform a resident what Brookhaven would consider adequate verification of a disability related need for an accommodation [Ex. F pg 99-100] Furthermore, Brookhaven has no written policy that would assure a disabled resident his or her medical information would not be made public. [Ex. F, pg 108-109]

30.    Brookhaven's counsel, who could not restrain himself from answering questions for the Corporate representative, [Ex. F pg. 10, 47, 48, 49, 109] pointed out that his letter commanding production of ""medical records, reports and/or documents" assured Capezza that the Board would "simply review the records at a regularly scheduled meeting and return them to you promptly." [DE 26, Ex. K] This assurance did not prevent Mr. Pilka from revealing the nature of Capezza's disability in a general meeting of Brookhaven residents later that day. [Ex. D, ¶ 8]

## STANDARD OF REVIEW

31.    Pursuant to Fed. R. Civ. P. 56(a), "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment  as a matter of law."  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there will be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986) (emphasis in original); see also *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574 (1986).  An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of

fact to find for the non-moving party. *Anderson*, 477 U.S. at 248; *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. It is "material" if it might affect the outcome of the case under the governing law. *Anderson,* 477 U.S. at 248. In addition, when considering a motion for summary judgment, the Court is required to view the evidence in the light most favorable to the non-moving party. Id. at 255.

32.     If the moving party bears the burden of proof at trial, the moving party must establish all essential elements of the claim or defense in order to obtain summary judgment. See U S  v. Four Parcels of Real Prop. in Greene & Tuscaloosa Counties, 941 F.2d 1428, 1438 (11th Cir. 1991). The moving party '"must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial."' Id. (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986) (Brennan, J., dissenting)). "If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response, 'come[s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact."' *Four Parcels*, 941 F.2d at 1438 (quoting *Chanel, Inc. v. Italian Activewear of Fla., Inc*., 931 F.2d 1472, 1477 (11th Cir. 1991)).

33.     By contrast, if the non-moving party bears the burden of proof at trial, the moving party may obtain summary judgment simply by establishing the nonexistence of a genuine issue of material fact as to any essential element of a non-moving party's claim or affirmative defense. *Celotex Corp*., 477 U.S. at 324. When the non-moving party bears the burden of proof, the moving party does not have to "support its motion with affidavits or other similar material negating the opponent's claim." Id. at 323 (emphasis in original). The moving party may discharge its burden in this situation by showing the Court that "there is an absence of evidence to support the nonmoving party's case." Id. at 324. Once the moving party discharges its initial

burden, a non-moving party who bears the burden of proof must cite "to particular parts of materials in the record" or show "that the materials cited do not establish the absence or presence of a genuine dispute."  Fed. R. Civ. P. 56(c)(l ).

### III. DEFENDANTS VIOLATED THE FHA BY FAILING TO ACCOMMODATE PLAINTIFFS' NEED TO LIVE WITH THEIR ASSISTANCE ANIMALS

34.    The FHA makes it unlawful to "discriminate against any [handicapped] person in the terms, conditions, or privileges of sale or rental of a dwelling[,]" 42 U.S.C. § 3604(f)(2). Disability discrimination includes "a refusal to make reasonable accommodation in rules, policies, practices or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). See also 24 C. F. R. § 100.204.

35.    To establish a failure-to-accommodate claim, a plaintiff "must prove that (1) he is disabled within the meaning of the FHA, (2) he requested a reasonable accommodation, (3) the requested accommodation was necessary to afford him an [equal] opportunity to use and enjoy his dwelling, and (4) the defendants refused to make the accommodation." *Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.*, 765 F.3d 1277, 1285 (11th Cir. 2014).

### CHARLIE SMITH IS ENTITLED TO SUMMARY JUDGMENT REGARDING HIS CLAIM THAT DEFENDANTS' VIOLATED THE FHA BY FAILING TO ACCOMMODATE HIS NEED TO LIVE WITH HIS ASSISTANCE ANIMAL

#### A. Charlie Smith had a disability

36.    A person has a disability under the FHA if, among other things, he has "a physical or mental impairment which substantially limits one or more of such person's major life activities." 42 U.S.C. § 3602(h). Charlie Smith suffered a physical impairment, severe hearing

loss. Hearing is a major life activity, and therefore at the time this suit was filed, Smith was disabled within the meaning of the FHA.  See 24 C.F.R. §100.201, (*Major life activities* means functions such as caring for one's self, performing manual tasks, walking, seeing, <u>hearing</u>, speaking, breathing, learning and working.) (emphasis added)

37.    Defendants knew or should have known of Smith's disability. According to the DOJ/HUD Joint Statement, depending on the individual's circumstances, "information verifying that the person meets the Act's definition of disability <u>can usually be provided by the individual himself or herself</u> (e.g., proof that an individual under 65 years of age receives Supplemental Security Income or Social Security Disability Insurance benefits or <u>a credible statement by the individual</u>)." (emphasis added) While Defendants have never indicated why Charlie Smith's own statement that he was disabled was not a "credible statement," Defendants were also provided a letter from Dr. Kasewurm, Smith's doctor, verifying that Smith suffered severe hearing loss in both ears. Defendants were also provided an explanation of the nexus between the disability and the need for an accommodation for the dog. [DE 26  Ex. H] Brookhaven had no reason to dispute the information in the letter provided by Smith's doctor, [Ex. F, pg. 14-15] or that the dog helped Smith by alerting him of visitors or potential intruders. [Ex. F, pg. 14-15] In fact, Brookhaven does not know why Smith was not given an accommodation for his dog after their counsel was provided Dr. Kasewurm's letter. [Ex. F, pg. 14-16]

**B.    Charlie Smith requested a reasonable accommodation**

38.    Smith requested an accommodation for his dog Roxy before ever moving to Brookhaven, and was told his dog was approved. [Ex. A, ¶ 6, Ex. E ¶ 6] Further, after Smith was subsequently commanded to get rid of Roxy or face legal action, on February 24, 2015, his

counsel forwarded the letter from Dr. Kasewurm to Brookhaven's counsel with a cover letter explaining the need for the accommodation, and concluding:

> *"I trust you have received adequate documentation of Mr. Smith's need to live with his dog as an accommodation of his hearing loss. If I have not received confirmation that Brookhaven Village has waived the community's no pet rule for Mr. Smith's assistance animal within 7 days of this correspondence, I will initiate a housing discrimination complaint on his behalf in federal court."* [DE 26 Ex. H]

### C. Such accommodation was necessary to afford Charlie Smith an equal opportunity to use and enjoy his dwelling

39.     Smith needed to be allowed to live with his dog Roxy. An accommodation is necessary if it would affirmatively enhance Mr. Smith's quality of life by ameliorating (or reducing) the effects of his disability. To show that a requested accommodation may be necessary, there must be an identifiable relationship, or nexus, between the requested accommodation and the individual's disability. *Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.*, 765 F.3d 1277, 1285 (11th Cir. 2014). Roxy helped Smith cope with his hearing loss by alerting him to sounds such as the door bell and potential intruders. [Ex. A, ¶5] Establishing an accommodation's necessity requires only proof the accommodation "address[es] the needs created by the handicap."  Id. at 1290, citing *Schwarz v. City of Treasure Island*, 544 F.3d 1201 (11th Cir. Fla. 2008.) Simply put, it is undisputed that Roxy helped Smith live with his severe hearing loss. Accordingly, the accommodation was necessary.

### D.     Defendants refused to make the requested accommodation.

40.     It is undisputed that Brookhaven failed to grant Smith an accommodation. Instead, Brookhaven demanded extraneous information including "medical records, reports and/or documents" and proof that Roxy was "certified," threatened Smith with litigation if he did

not go to mediation at his own expense, and then initiated a lawsuit against him seeking removal of his assistance animal and to force Smith to pay Brookhaven's legal bills. [Ex. B]

41.     It is undisputed that Brookhaven had no reason to  disbelieve that Smith had in fact been told before moving to the community that Roxy would not be a problem [Ex. F, pg 33, lines 7-16], and that Brookhaven had no objective reason to doubt that Mr. Smith needed a dog to help him compensate for his hearing loss, [Ex. F, Pg 73, lines 6-11], yet nonetheless sued Smith seeking to have him remove Roxy and pay the Association's legal fees. [Ex. B]

42.     It is undisputed that each of the five individual Defendants voted to initiate legal action against Smith and Capezza. [DE 40, ¶78, 98, 109, 120,131]

43.     By voting to initiate a lawsuit seeking removal of Smith's assistance animal Roxy, the individual Defendants were personally involved in discriminating against Smith. See *Sabal Palm Condos. of Pine Island Ridge Ass'n v. Fischer*, 2014 U.S. Dist. LEXIS 32705 (S.D. Fla. Mar. 13, 2014) (Individual board members or agents can be held liable when they "personally committed or contributed to a Fair Housing Act violation.") citing *Falin v. Condominium Ass'n of La Mer Estates*, 2011 U.S. Dist. LEXIS 129927 (S.D. Fla. Nov. 9, 2011)

### DOROTHY CAPEZZA IS ENTITLED TO SUMMARY JUDGMENT REGARDING HER CLAIM THAT DEFENDANTS' VIOLATED THE FHA BY FAILING TO ACCOMMODATE HER NEED TO LIVE WITH AN EMOTIONAL SUPPORT ANIMAL

**A.     Dorothy Capezza has a disability**

44.     Dr. Erika Friedmann, Associate Dean of Research for the University of Maryland's School of Nursing, has researched the health effects of human – animal interactions since the late 1970s. She is an internationally recognized researcher and expert on  the basis of the health effects of human—animal interactions. Dr. Friedmann reviewed Ms. Capezza's

medical records detailing five years of treatment by her primary care physician Dr. Preeti Harchandani, and interviewed Capezza by telephone. [Exhibit C, ¶ 2,5,6][Dr. Friedmann's Curriculum Vitae is included in Exhibit G, pg 182-215]

45.     A "physical or mental impairment" as defined by the FHA includes "[a]ny mental or psychological disorder, such as . . . emotional or mental illness . . . " 24 C.F.R. §100.201. Dorothy Capezza suffers from and has a history of suffering from major depression, anxiety and hypertension. Capezza's disabilities impact her cognition, her ability to work, care for herself and otherwise carry out daily life activities. Since losing her dog, Capezza no longer walks three times a day like she did when Buttons was alive. In fact she rarely goes out at all. According to Dr. Friedmann, Capezza's depression and anxiety "are characterized by a lack of interest in others and in social interaction, difficulty getting out of bed, difficulty in taking care of herself and of her living environment, and difficulty leaving the house.  Her high anxiety levels are also manifest in physical symptoms such as difficulty sleeping.  Capezza has ceased her active lifestyle since she has not had a dog.   She spends most of the day sitting in front of the TV or reading.  She no longer goes bowling or to the gym. " [Ex. C ¶2, 3,9,10]

46.     The record unequivocally demonstrates that Capezza has a mental disability that substantially impairs her major life activities.

## B.     Dorothy Capezza requested a reasonable accommodation

47.     Like Charlie Smith, Dorothy Capezza requested an accommodation before ever moving to Brookhaven with her dog Buttons, and was told she had been approved. [Ex. D, ¶ 4][Ex. E,¶6][Ex. H, pg 19] Brookhaven has no reason to doubt that Capezza was told she could have her dog. [Ex. F, pg 23 and pg 36]

48.     After Capezza was sent a letter demanding that Buttons be removed or she would face legal action, Capezza informed Defendant's counsel that she had been approved to have the dog, and that the dog provides support for her anxiety. [DE 26 Ex. J]

49.     On behalf of Capezza, on February 20, 2015, Capezza's counsel responded to Brookhaven's demand for "medical records, reports and/or documents" and proof that Cappezza's emotional support animal had received training that set it apart from an "ordinary pet," explaining that emotional support animals do not require training and that Brookhaven did not need and was not entitled to Capezza's medical records. Capezza's counsel offered that if there was an objective reason to doubt that there is a legitimate need for an accommodation, "please let me know and we can begin the interactive process to provide you verification within the parameters HUD and courts have established regarding the appropriate scope of inquiry that can be made by a housing provider." [DE 26  Ex. E]

50.     Defendants never indicated any reason why they would be skeptical of Capezza's disability related need for an accommodation, or requested specific information regarding Capezza's disability as opposed to making an overly broad demand for unspecified "medical records, reports and/or documents." Brookhaven's corporate representative, produced to testify as to the basis for the failure to allow Dorothy Capezza to replace her emotional support animal, stated she was not aware of any objective reason to doubt that Dorothy Capezza needs an emotional support animal. [Ex. F pg 73, lines 14-19] When the same witness was asked why the two prescriptions provided by Dr. Harschandani were not adequate to convince the board that Capezza needed an accommodation for her emotional support animal, the witness replied "I don't know." [Ex. F pg 25, lines 1-6] Undersigned counsel followed up: "Can you tell me why my

client has not been provided an accommodation so that she can obtain another emotional support animal?" the witness stated "No. I can't tell you anything." [Ex. F pg 25, lines 8-13]

51.    Were it not already obvious that Dorothy Capezza wants an accommodation so that she may obtain another emotional support animal after losing Buttons, Defendants were certainly on notice after being served with the instant lawsuit seeking an order that "awards to Plaintiffs the reasonable accommodation they have requested from BROOKHAVEN, which is a waiver of any policy that would prevent Plaintiffs from residing in their dwelling units with their assistance animals," and that expressly stated "CAPEZZA would like to obtain another emotional support animal to assist her with her anxiety, but has not done so because of the pending demands for extraneous information regarding her disability and threat of litigation." [DE 26] More than a year later, after providing five years of medical records and Dr. Friedmann's declaration, even though Brookhaven has all the information it needs to grant the accommodation. [Ex. F. pg 101], Capezza still has not received confirmation that Brookhaven's no-pet rule will be waived as an accommodation of her disabilities.

**C. Such accommodation is necessary to afford Dorothy Capezza an equal opportunity to use and enjoy her dwelling**

52.    According to Dr. Friedmann:

*It is my opinion that living with an emotional support animal is necessary for Dorothy Capezza in order for her to have the same opportunity to enjoy her dwelling as a non-disabled person.   It is my opinion that the therapeutic benefits of living with her emotional support animal affirmatively enhanced Dorothy Capezza's quality of life by reducing the effects of her disability and that a new emotional support animal would do the same.* [Ex. C, ¶ 2]

53.    Dr. Friedmann bases her opinion on Capezza's medical history and personal interview, and in part upon studies that document the decreased stress responses (physiological

indicators of anxiety, such as blood pressure) when animals are present. Friedmann notes "stress responses are particularly dangerous for individuals with hypertension such as Ms. Capezza. " [Ex. C, ¶ 3,9,10]

54.     Also underpinning Dr. Friedmann's opinion as to Capezza's need to reside with a dog as an emotional support animal are that "Ms. Capezza has lost interest in social interactions as a component of her major functional impairment associated with her disability" and dogs are effective at inducing social interactions for people who are socially isolated and "studies unambiguously documented that animal assisted interventions resulted in significant reductions in depression, decreased stress responses, and increased social interactions in adults."  [Ex. C, ¶ 10]

55.     Capezza testified at her deposition that Buttons would get her up and going in the morning, that they would walk three times a day, and that she was less depressed and anxious when Buttons was with her. Since his passing, Capezza has been relying upon prescribed sleeping pills, barely leaves her house, no longer goes to the gym and no longer tends her garden. She testified that that the dog got her to do things she no longer does. [Ex. H, pg 55-57]

56.     It is necessary that Capezza be allowed to live with an emotional support animal. An accommodation is necessary if it would affirmatively enhance Capezza's quality of life by ameliorating (or reducing) the effects of her disability. *Bhogaita v. Altamonte Heights Condo. Ass'n*, 765 F.3d 1277 (11th Cir. Fla. 2014) The record clearly establishes that Buttons helped ameliorate the symptoms of Capezza's depression and anxiety by providing companionship and emotional support, elevating her mood, and forcing her to get out of the house and walk three times a day.  Being able to obtain and live with another dog would benefit Capezza by reducing

the impacts of her disabilities. Accordingly, the accommodation is necessary. *Smith v. Powdrill*, 2013 U.S. Dist. LEXIS 154485 (C.D. Cal. Oct. 28, 2013)

**D. Defendants refused to make the requested accommodation.**

57.    Brookhaven was provided two prescriptions signed by Preeti Harchandani, MD, Ms. Capezza's primary care physician, attesting that Capezza needs her dog "for companionship due to anxiety issues" and "for emotional well being and support." Verification of a disability related need for an accommodation need not contain fair housing jargon like "disability," and "substantially affects major life activities."  To the contrary, "documentation is sufficient if it establishes that an individual has a disability and that the animal in question will provide some type of disability related assistance or emotional support." (Service Animals and Assistance Animals for People with Disabilities in Housing and HUD-Funded Programs, FHEO Notice: FHE0-2013-01 (April 25, 2013)) [D26, Exhibit G]  The prescriptions from Dr.  Harchandani indicate that Capezza needs an emotional support animal because of her anxiety. In the absence of any objective reason to be skeptical of Capezza's disability or need for an accommodation, that should have been enough. Brookhaven does not know why the prescriptions were not adequate to convince the board that Capezza needed an accommodation for her emotional support animal or why Capezza has not been given an accommodation. The corporate representatives answers are binding on Brookhaven.  See *QBE Ins. Corp. v. Jorda Enters*., 277 F.R.D. 676 (S.D. Fla. 2012). (When a corporation's designee legitimately lacks the ability to answer relevant questions on listed topics and the corporation cannot better prepare that witness or obtain an adequate substitute, then the "we-don't-know" response can be binding on the corporation and prohibit it from offering evidence at trial on those points. Phrased differently, the lack of knowledge answer is itself an answer which will bind the corporation at trial.")  citing

21

*Fraser Yachts Fla., Inc. v. Milne*, No. 05-21168-CIV-JORDAN, 2007 U.S. Dist. LEXIS 27546,

2007 WL 1113251, at *3 (S.D. Fla. Apr. 13, 2007); *Chick-Fil-A v. ExxonMobil Corp*., No. 08-

61422-CIV, 2009 U.S. Dist. LEXIS 109588, 2009 WL 3763032, at *13 (S.D. Fla. Nov. 10,

2009); see also *Ierardi v. Lorillard*, No. 90-7049, 1991 U.S. Dist. LEXIS 11320, 1991 WL

158911 (Aug. 13, 1991) (E.D. Pa. 1991) (if party's 30(b)(6) witness, because of lack of

knowledge or failing memory, provides a "don't know" answer, then "that is itself an answer"

and the corporation "will be bound by that answer").

58.    Assuming Brookhaven did actually have an objective reason to question whether

Capezza needed the ability to live with an emotional support animal, the proper course would

have been to request additional information regarding the only two relevant inquiries: whether

Capezza's anxiety and depression amount to a qualifying disability, and whether living with an

emotional support animal helps alleviate the effects of her anxiety and depression. See *Bhogaita*

at 1287. Instead, even though Dr. Harchandani's prescriptions identified a cognizable disability,

anxiety, Defendants requested unspecified "medical records, reports and/or documents," told

Capezza she must demonstrate "how this emotional service animal reasonably accommodates

your medical or psychiatric disability or handicap," and that the "emotional service animal has

special skills or training to accommodate your medical disability" and demonstrate "how the

special skills or training of the service animal or emotional support animal set it apart from an

ordinary pet." When she failed to do so within a week, she was served an "offer" to participate in

mediation at her own expense, and cautioned that if she failed to capitulate she might be sued.

59.    Demands for extraneous information regarding a requested accommodation

constitute a constructive denial. *Bhogaita v. Altamonte Heights Condo. Ass'n*, 765 F.3d 1277

(11th Cir. Fla. 2014) ( upholding district court's determination that the defendant's demand that

plaintiff remove his dog "if he did not provide [the Association] with information it was not entitled to receive" was constructive denial of a request for accommodation, and granting summary judgment on the refusal to accommodate element.) As noted by the court in *Bhogaita*, housing providers generally need "only the information necessary to apprise them of the disability and the desire and possible need for an accommodation."  citing *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 506 (3d Cir. 2010) (holding in a reasonable accommodation claim brought under the ADA that employers need "enough information to know of both the disability and desire for an accommodation" (internal quotation marks omitted)); also citing Joint Statement at 14[1] (counseling that, "[i]n most cases, an individual's medical records or detailed information about the nature of a person's disability is not necessary for" determining whether an accommodation is required). [DE 26, Ex. G]

60.    Capezza has been without an emotional support animal for more than a year because Brookhaven has failed to grant her an accommodation, insisting upon extraneous information and proof of training. See *Overlook Mutual Homes, Inc. v. Spencer*, 415 F. App'x 617, 622 (6th Cir. 2011) ("a housing provider that refuses to make a decision unless a requestor provides unreasonably excessive information" could be found to have "constructively denied the request [for an accommodation] by 'stonewalling' and short-circuiting the process"). There are no genuine disputed issues of fact that prevent granting summary judgment on this point.

### RUPERT, BERNDT, BURTON CRITTENDEN & WALKER HAVE EACH PERSONALLY CONTRIBUTED TO THE FAILURE TO ACCOMMODATE PLAINTIFFS' NEED FOR THEIR ASSISTANCE ANIMALS

61.    All of the individual Defendants admit voting  to initiate legal action against Plaintiffs. [DE 40, ¶78, 98, 109, 120,131]

---

[1] Department of Justice and HUD, Joint Statement on Reasonable Accommodations at 11 (May 17, 2004), available at www.hud.gov/offices/fheo/library/huddojstatement.pdf

62.     Individual board members can be held liable when they "personally committed or contributed to a Fair Housing Act violation." *Falin v. Condominium Association of La Mer Estates, Inc.*, 2011 WL 5508654 at 3 (S.D. Fla. 2011). The individual Defendants all voted in favor of initiating legal action against Plaintiffs, notwithstanding the fact that defendants knew Capezza and Smith had asserted they needed to live with their dogs because of disabilities, and had been previously led to believe they had been approved to have their dogs.

63.     The amended complaint alleges each individual defendant, asserting that he or she "as a member of BROOKHAVEN's Board of Directors, voted to authorize initiation of legal action against Plaintiffs rather than grant them  the accommodations to which they are entitled." Each individual defendant responded exactly as did Jim Rupert:

> Defendant RUPERT would admit that he voted to enforce the Declarations of Covenants and Restrictions as written but would deny that he ever voted to refuse Plaintiffs' request for accommodations. Rather, the decision on how to proceed with Plaintiffs' request was never decided by the Board while the Defendants were still hopeful that the Plaintiffs would produce the information and evidence of the Plaintiffs' disability and need for the service animal or emotional support animal as previously requested. Currently, RUBERT would deny that he at any time denied the Plaintiffs' FHA rights or discriminated against the Plaintiffs on the basis of their purported disabilities.

64.     Had the individual defendants been wholly ignorant of Smith and Capezza's claims of a disability related need for accommodations, perhaps they could characterize such a vote as a "decision to enforce the Declarations of Covenants and Restrictions. " However, "[a]s a general rule, housing providers should cooperate with residents to resolve disputes over reasonable accommodations rather than turning to the courts." *Overlook Mut. Homes, Inc. v. Spencer*, 415 Fed. Appx. 617 (6th Cir. Ohio 2011)

65.     Capezza never refused to provide additional information. On February 20, 2015, through counsel, both Smith and Capezza offered to provide "verification within the parameters HUD and courts have established regarding the appropriate scope of inquiry that can be made by a housing provider" provided there was an objective reason to doubt either had a legitimate need for an accommodation. Nonetheless, three days later the individual Defendants voted to initiate a lawsuit against Plaintiffs, a curious action to take if they really "were still hopeful that the Plaintiffs would produce the information and evidence of the Plaintiffs' disability and need for the service animal or emotional support animal as previously requested."

66.     By voting to sue Capezza and Smith, knowing all along that both had asserted that they needed their dogs to help ameliorate the effects of their disabilities, all five individually named defendants personally committed or contributed to violations of the FHA. A showing that the individual board members had any animus or discriminatory intent is not required. See *United States v. Tropic Seas, Inc*., 887 F. Supp. 1347,1365 (D. Hawaii 1995) (Because the duty to comply with the Fair Housing Act is non-delegable, a corporation's officers and directors may be held individually liable for their failure to ensure the corporation's compliance. This is so even where the individual director or officer did not actively participate in the alleged discrimination and did not subjectively intend to discriminate against the complainant.)(internal citations omitted).

67.     Board members who participate in, authorize, or ratify the commission of a FHA violation maybe held individually liable. It is undisputed that the individual defendants are liable for failing to accommodate Capezza and Smith.

**INTIMIDATION BY DEFENDANT BROOKHAVEN**

**BROOKHAVEN VIOLATED THE FHA BY THREATENING TO SUE CAPEZZA AND SMITH AND BY ACTUALLY SUING SMITH**

68.     In the Eleventh Circuit, a party is liable pursuant to 42 U.S.C. § 3617 if (1) he or she has coerced, intimated, threatened or interfered; (2) with a Plaintiff's exercise or enjoyment of his [or her] Fair Housing rights or a Plaintiff's aiding of another's exercise or enjoyment of such a right; (3) because of a discriminatory or retaliatory animus. 42 U.S.C. § 3617; *Sofarelli v. Pinellas County*, 931 F.2d 718, 721-23 (11th Cir. 1991). Section 3617's prohibition includes, among other things, "retaliation" for having exercised, enjoyed or aided someone in exercising or enjoying such a right. *See also* 24 C.F.R. § 100.400(c).[2] Courts, including the U.S. Supreme Court, the United States Eleventh Circuit and the Southern District of Florida, have consistently held that a lawsuit filed in response to a persons' assertion of their civil rights constitutes retaliation as a matter of law. *Sofarelli* 931 F.2d at 721-23 (holding that neighbors' suit for injunctive relief constituted retaliatory interference with counterclaimant's Fair Housing rights).

69.     In this case, when Plaintiffs explained they had already been given permission to reside with their assistance animals, Brookhaven demanded extraneous information and a week later served a "STATUTORY OFFER TO PARTICIPATE IN PRE-SUIT MEDIATION." Although Plaintiffs had each received one single demand for unspecified medical records and proof their dogs had been trained, these mediation offers stated that:

---

[2] See also *Bill Johnson's Restaurants, Inc. v. N.L.R.B.*, 461 U.S. 731, 740-41, (1983) (The threat of an employer suit against an employee can be a "powerful instrument of coercion" because, "[r]egardless of how unmeritorious the employer's suit is, the employee will most likely have to retain counsel and incur substantial legal expenses to defend against it"); *Housing Opportunities Project For Excellence, Inc. v. Key Colony No. 4 Condominium*, 510 F. Supp. 2d 1003, 1013 (S.D. Fla. 2007) ("Key Colony") (acknowledging that an enforcement suit can constitute unlawful retaliation*); Zhu v. Countrywide Realty, Co., Inc.*, 165 F. Supp. 2d 1181, 1198-99 (D. Kan. 2001) (Upholding Fair Housing retaliation claim where defendant's counsel first threatened legal action and then filed petition for a restraining order against plaintiff); *U.S. v. Scott*, 788 F. Supp. 1555, 1561--62 (D. Kan. 1992); *U.S. v. Wagner*, 940 F. Supp. 972, 978-83 (N.D. Tex. 1996) (holding that filing of a baseless lawsuit to preclude exercise of fair housing rights is not protected by the first amendment right to petition); *Schroeder*, 879 F. Supp. 173 (holding that the threat of and actual filing of a lawsuit may form the basis of a Fair Housing retaliation claim).

> *"you have received <u>numerous</u> requests from the Association to bring your property into compliance by submitting an application and documentation for the dog you are keeping at your property. Yet, despite <u>numerous requests</u> to remedy these situations by your association  and by its Property Manager, you went ahead without submitting an Application and documentation for the Board to review and approve. These requests have been totally ignored by you and as a result your property has been referred to our firm for legal action."*  (emphasis added)

70.     The "STATUTORY OFFER TO PARTICIPATE IN PRE-SUIT MEDIATION" served on Smith and Capezza warns them that if they fail to participate in mediation, fifty percent of the cost of which was to be borne by Plaintiffs, "suit may be brought against you by the Association without further warning." In the case of Charles Smith, suit was brought against him without further warning.

71.     The action of threatening suit against Plaintiffs and demanding pre-suit mediation, and the act of suing Charlie Smith seeking to force removal of his assistance animal and to force him to pay the Association's fees constitutes interfering, coercing or intimidating Plaintiffs for having exercised their legal rights under the Fair Housing Act. Brookhaven disingenuously attempts to hide behind the supposedly mandatory language dictated by Section 720.311, Fla. Stat. ignoring the fact that Brookhaven chose to "offer" pre-suit mediation in the first place. While such a statutory notice must be phrased as required by law, nobody forced Brookhaven to serve a demand for mediation at all. A housing provider may meaningfully review a disabled resident's request for a waiver of a no pet rule without serving a statutory offer to participate in pre-suit mediation. Brookhaven could easily have asked Smith and Capezza to participate in mediation without utilizing the fee shifting procedure outlined in Section 720.311, Fla. Stat., and clearly did so only to preserve the ability to force Plaintiffs to pay their attorneys' fees after Brookhaven initiated lawsuits against them.

27

72.     The undisputed facts show Brookhaven's conduct interfered with Plaintiffs' exercise of their right to live with their assistance animals as a reasonable accommodation of their disabilities. See *Smith v. Powdrill*, 2013 U.S. Dist. LEXIS 154485 (C.D. Cal. Oct. 28, 2013) ("By responding to Plaintiff's request for an accommodation for her disability by issuing her a 3-Day Notice, and subsequently reiterating that they wanted Plaintiff out of the apartment if she insisted on keeping the companion animal, Defendants engaged in conduct that would give a person in Plaintiff's position cause to hesitate in seeking to enforce her right to obtain a reasonable accommodation for her disabilities."), see also *Hopler v. Crystal Tower, Inc*., 2014 U.S. Dist. LEXIS 112278 (S.D. Fla. June 19, 2014), finding that conduct by defendant condominium association of sending a letter threatening legal action and subsequently filing a Petition for Mandatory Non-Binding Arbitration supported a claim for retaliation in violation of 42. U.S.C. 3617.

## INTIMIDATION BY JIM RUBERT

Capezza and Judy Shimunek both have attested that Jim Rubert, after voting to initiate legal action against Capezza and Smith on February 23, 2015, approached Plaintiffs and stated that it is a crime to lie about your dog being a service dog, specifically  a "class D felony." [Ex. A, ¶12] [Ex. H pg 24-25]This statement was clearly intended to intimidate Plaintiffs into abandoning their right to live with their assistance animals.

Section 3617 is not limited to those who used some sort of "potent force or duress," but extends to other actors who are in a position directly to disrupt the exercise or enjoyment of a protected right and exercise their powers with a discriminatory animus. *Michigan Protection & Advocacy Serv. v. Babin*, 18 F.3d 337, 347 (6th Cir. Mich. 1994). As a board member, Rubert was in such a position.  See also *Perez v. Cambeyro*, 2015 U.S. Dist. LEXIS 175721, *16-19

28

(S.D. Fla. Sept. 1, 2015) (  "a plaintiff sufficiently states a retaliation claim where he alleges that the defendant threatened to terminate the plaintiff's lease, mentally antagonized the plaintiff, and levied frivolous fines in retaliation for the plaintiff's attempts to receive accommodations and for filing complaints with housing agencies.") Rubert insinuated to disabled residents that they have committed a criminal act by merely having asserted their right to live in their own homes with the assistance animals that helped them cope with their disabilities. Rubert's conduct would give disabled residents in Plaintiffs' position cause to hesitate in seeking to enforce their right to a reasonable accommodation for their disabilities, and accordingly constitutes illegal  interference with Plaintiffs' exercise of their fair housing rights.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant Plaintiffs' motion for summary judgment on the issue of Defendants' liability and grant a trial on damages.

Respectfully submitted this 4th of April, 2016.

BY:/s/ Marcy LaHart
Marcy I. LaHart, Esq.
Florida Bar No. 0967009
Marcy@floridaanimallawyer.com
MARCY I. LAHART, P.A.
4804 SW 45th Street
Gainesville, Florida 32608
Telephone (352) 224-5699
*Attorney for Plaintiff*

BY: /s/ Sarah M. Hayter
Robert N. Hartsell, Esq.
Florida Bar No. 636207
Sarah M. Hayter, Esq.
Florida Bar No. 83823
Robert@Hartsell-Law.com
Sarah@Hartsell-Law.com
ROBERT N. HARTSELL, P.A.
Federal Tower Building
1600 S. Federal Highway, Suite 921
Pompano Beach, Florida 33062
Telephone (954) 778-1052
Facsimile (954) 941-6462
*Attorney for Plaintiff*

## <u>CERTIFICIATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via CM/ECF electronic mail service to this 4th day of April, 2016 to the Clerk of the Court. I also certify that the foregoing document is being served this day on all counsel of record.

BY:     <u>/s/Marcy I LaHart</u>
**Marcy LaHart, Esq.**
Florida Bar No. 0967009